**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**Keaton Landry,**

       **Plaintiff,**

**v.**                                    **Case No. 25-cv-4030-JWL**

**The Carswell Group d/b/a**
**Independent Management Services,**

       **Defendant.**

## MEMORANDUM & ORDER

Plaintiff Keaton Landry filed this lawsuit against his former employer asserting claims of discriminatory discharge, failure to accommodate and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., as amended by the ADA Amendments Act of 2008 ("ADAAA"). He also asserts that his former employer terminated his employment in violation of Kansas public policy. This matter is presently before the court on defendant's motion for summary judgment on all claims (doc. 52). The motion is granted in part and denied in part. As explained below, defendant's motion is granted as to plaintiff's ADA discriminatory discharge and failure-to-accommodate claims; is denied as to plaintiff's ADA retaliation claim; is granted as to plaintiff's state law public policy claim to the extent that claim is based on plaintiff's requests for heat in the maintenance garage; and is denied as to plaintiff's state law public policy claim to the extent the claim is based on plaintiff's reports about wiring issues at the apartment complex where he worked.

## I.    Facts

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to the nonmoving party.  Plaintiff Keaton Landry began working as a maintenance technician at the Green Park Apartments in Junction City, Kansas in November 2022. Defendant acquired the Green Park Apartments in July 2023 and defendant began his employment with defendant at that time, continuing in his position as a maintenance technician at the apartment complex.  At some point prior to November 2022, plaintiff sustained an on-the-job injury that ultimately required shoulder and neck surgery.  Plaintiff's injury left him with residual nerve damage that, in turn, resulted in occasional flare-ups consisting of neck and head pain and numbness and weakness in his hands.

When plaintiff began his employment with defendant, Jennifer Jones served as his immediate supervisor.  Starting in September 2023, Taya Flanagan was promoted to "site manager" and, in that capacity, had supervisory authority over plaintiff.  Ms. Flanagan took over the site manager role when defendant terminated the employment of Kelly Farley, who had held that role with the prior owner.  The record reflects that plaintiff viewed both Ms. Jones and Ms. Flanagan as his supervisors.

At the outset of plaintiff's employment, defendant provided him with a Voluntary Self-Identification of Disability form.  On that form, plaintiff indicated that he did not want to answer whether he had a disability.  On August 2, 2023, about 10 days after completing that form, plaintiff sent a text message to Ms. Jones in which he stated the following:

2

Hey Jennifer.   I didn't understand the questions on the application regarding disabilities.  I though I had to have some official classifications.  I was speaking with [Ms. Farley] and she said I should get with you to let you know that I did have some of those items.  Just let me know if I need to fill out anything.  Basically, I had neck and shoulder surgery last year from a workers comp injury.  I have some residual nerve damage and some other issues.  I was clear to work by then.

Ms. Jones testified that she understood plaintiff's text to mean that plaintiff had prior issues but "was cleared to work now."  Plaintiff testified that shortly after he sent the text message to Ms. Jones, he had an in-person discussion with Ms. Jones about the message.  According to plaintiff, he explained the nature and extent of his injuries to Ms. Jones, who indicated that she understood because her husband had a similar injury.  Plaintiff testified that he told Ms. Jones that he "was going to need time off for flare-ups" and that Ms. Jones said that she would be able to accommodate him.  Plaintiff also testified that he made other requests for accommodations, including the use of a rolling cart to move materials and a platform to help with ceiling work.  He testified that he asked Ms. Flanagan and Ms. Jones for these items "multiple times" but that those items were not provided.   Finally, plaintiff testified that he asked defendant to heat the maintenance garage on multiple occasions but that his request was largely ignored except for the addition of space heaters which plaintiff contends did not work well enough to mitigate the cold temperatures in the garage during the winter months.

On November 2, 2023, defendant provided plaintiff with a corrective action form for missing eight days of work, arriving late to work on one day, and leaving work early on three days.  Plaintiff signed the corrective action form and added the following statement: "I have a disability that is causing me to have to miss." Viewed in the light most favorable to plaintiff, the record reflects that defendant never followed up with plaintiff with respect to this statement.

3

According to defendant, it did not follow up because plaintiff never provided medical documentation of his limitations. Plaintiff, however, testified that no one ever asked him to provide medical documentation of his limitations. According to plaintiff, Ms. Jones indicated that defendant would accommodate his flare-ups and never asked for additional information from plaintiff. In fact, plaintiff testified that Ms. Jones told him he did not need to provide documentation. Moreover, the record reflects that plaintiff, on the days when he was going to miss work for flare-ups, texted Ms. Flanagan to let her know why he was missing work. Ms. Flanagan testified that she did not respond to plaintiff's texts about missing work for neck or back pain because she felt like it was not any of her business.

On January 4, 2024, a small electrical fire occurred in the wall of an apartment in the complex. The tenant was able to extinguish the fire by shutting off the electricity in the apartment. Plaintiff asserts that the fire was caused by a wiring problem that existed throughout the complex. Specifically, plaintiff testified that the apartment complex utilized aluminum wiring connected to copper fixtures which constitutes a fire hazard. According to plaintiff, the hazard can be mitigated by installing specialized connectors to reduce the risk of overheating. Plaintiff testified that he had discussed this wiring issue with multiple electrical contractors prior to January 2024 and that he had raised his concerns about the wiring with defendant prior to January 2024 but that defendant took no action with respect to the wiring issues.

On January 5, 2024, plaintiff called Junction City Code Enforcement to report the wiring issues that existed at Green Park. Junction City Code Enforcement told him that he could file paperwork regarding those issues but he declined to do so. On the same day, plaintiff called the Kansas Housing Resources Corporation to complain about the wiring issues at Green Park. That

agency advised him that it was already scheduled to do a paperwork audit of Green Park and would raise his concerns during that audit. Plaintiff also called the State Fire Marshal to complain about the wiring issues at Green Park. Plaintiff advised Ms. Flanagan later that day that he had reported his concerns to three government agencies.

Just a few days after plaintiff's calls to outside agencies about the wiring issues at Green Park, plaintiff again complained to defendant about the lack of heat in the garage. On January 12, 2024, plaintiff and his coworker Shamekin Higgs sent an email to defendant's Vice President reiterating concerns about the lack of heat in the garage. Later that day, defendant provided plaintiff with another corrective action form reflecting that defendant was terminating plaintiff's employment due to excessive absenteeism. Plaintiff signed the form and added the following statement: "I missed work due to current medical issues." The decision to terminate plaintiff's employment was made by Ms. Jones, Ms. Flanagan, Brooke Harms and Blake Hunter.[1] While defendant asserts that Ms. Flanagan's role in the decision was limited to confirming the dates that plaintiff was absent from work, Ms. Jones testified that Ms. Flanagan was the individual who initiated the discussion about terminating plaintiff's employment. It is uncontroverted that Ms. Jones knew about plaintiff's January 12, 2024 email concerning the lack of heat in the garage at the time the final decision to terminate plaintiff's employment was made.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

---

[1] Neither party has directed the court to evidence concerning what positions Ms. Harms and Mr. Hunter held with defendant.

## II.    Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.    Plaintiff's ADA Claims

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  The statute defines discrimination to include not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. *Id*. § 12112(b)(5)(A).  The ADA also prohibits employers from retaliating against an employee for engaging in certain protected activities, including requesting a reasonable accommodation. 42 U.S.C. § 12203(a); *Lincoln v. BNSF Ry. Co*., 900 F.3d 1166, 1209 (10th Cir. 2018).  In the pretrial order, plaintiff asserts three ADA claims, alleging that defendant terminated his employment based on his disability; failed to accommodate his disability; and terminated his employment in retaliation for requesting accommodations.

6

Defendant moves for summary judgment on all claims. As will be explained, defendant's motion for summary judgment is granted as to plaintiff's discriminatory discharge and failure-to-accommodate claims and is denied as to plaintiff's retaliation claim.

*A.      Whether Plaintiff has a Disability*

To proceed with his discriminatory discharge claim and his failure-to-accommodate claim, plaintiff must establish that he has a "disability." *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020) (citations and footnotes omitted); *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 995 (10th Cir. 2019).  Defendant moves for summary judgment on both claims on the grounds that plaintiff cannot establish that he is a disabled person for purposes of the ADA.  Under the ADA, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).  In the pretrial order, plaintiff contends only that he has an actual impairment under paragraph (A). Thus, plaintiff "must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014) (quoting *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir.2011)). While this burden is not an "onerous" one, "it is not sufficient for a plaintiff to identify an impairment and leave the court to infer that it results in substantial limitations to a major life activity." *Sanchez v. Vilsack*, 695 F.3d 1174, 1178-79 (10th Cir. 2012). At the summary judgment stage, plaintiff "must point to some evidence" showing that his impairment limits some major life activity.  *Id*. at 1178.  Among the major life

7

activities in the ADA are caring for oneself, performing manual tasks, standing, lifting, walking and working.  *See EEOC v. BNSF Ry. Co.*, 853 F.3d 1150, 1156 (10th Cir. 2017); 42 U.S.C. § 12102(2)(A).  "Whether the plaintiff has an impairment within the meaning of the ADA and whether the conduct affected is a major life activity for purposes of the ADA are questions of law for the court to decide." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007) (internal quotation and citation omitted). The determination of "whether the impairment substantially limits the major life activity is a question of fact for the jury, although a court is not precluded from deciding the issue on a motion for summary judgment." *Id.*

In its motion for summary judgment, defendant argues that plaintiff, throughout the litigation process, has "never articulated what the impairment is and the major life activity affected by it."  This assertion is not entirely accurate, for plaintiff has clearly articulated in the pretrial order that his disabling condition is "nerve damage" that causes "significant limitation on major life activities such as working and general movement."  *See* Doc. 49, ¶ 4.a.i. Nonetheless, in response to the motion for summary judgment, plaintiff simply does not address the threshold issue of whether he is disabled within the meaning of the ADA. His argument focuses entirely on the interactive process and whether he was required, during his employment, to submit medical evidence of his impairment to trigger defendant's obligation to engage in the interactive process regarding accommodations.  By limiting his arguments to the issue of whether defendant had sufficient notice of his alleged disability, plaintiff has completely overlooked the distinct issue of whether, for purposes of getting his disability claims to a jury, he presently has come forward with sufficient evidence that his impairment substantially limits a major life activity as required by the statute.

Even putting to the side the fact that plaintiff himself has made no argument addressing the issue of whether he is disabled, the record before the court contains nothing to support the inference that he is disabled. In his statement of facts, plaintiff, citing his own deposition testimony, identifies a laundry list of symptoms resulting from his prior work injury and his post-surgery nerve damage. These symptoms include neck pain, headaches, vertigo, numbness and weakness in his hands, migraines and nausea. But no evidence in the record shows how these symptoms were disabling or how his impairment interfered with any major life activity.[2] He has provided no medical evidence from which the court might conclude that plaintiff has an impairment that limits a major life activity. In fact, the record, viewed in plaintiff's favor, permits only the conclusion that plaintiff, on occasion, missed work because of issues relating to his nerve damage. But missing work, without additional evidence of limitation, is not sufficient to support an inference that plaintiff's impairment substantially limited his ability to work. *Anderson v. Textron Aviation, Inc.*, 2024 WL 51338, at *5 (D. Kan. Jan. 4, 2024) (evidence that plaintiff had to miss two or three days of work due to a cellulitis flare in 2020, standing alone, cannot support an inference that plaintiff's cellulitis substantially limited his ability to work).

The court has little doubt that the Circuit would find that plaintiff's showing on summary judgment falls far short of what is required to establish a disability for purposes of the ADA. Recently, the Tenth Circuit examined analogous allegations in a complaint alleging discrimination under the New Mexico Human Rights Act. *Spinelli v. Coherus Biosciences, Inc.*, 167 F.4th 1274

---

[2] Plaintiff also asserts in response to one of defendant's factual statements that his injuries "significantly limited his activities of daily living, including his ability to lift, stand, climb, bend, and work." But plaintiff provides no citation to the record that supports this broad statement.

(10th Cir. 2026).[3]  In that case, the district court dismissed the plaintiff's disability claims under Rule 12(b)(6) after finding that the plaintiff failed to plausibly allege a disability.  *Id*. at 1279. More specifically, the district court held that the plaintiff did not plead any facts suggesting that his impairment affected a major life activity.  *Id*. at 1281. On appeal, the Circuit affirmed the district court:

> Although Mr. Spinelli correctly notes that we make reasonable inferences in the plaintiff's favor at this stage, there is nothing in the complaint to support a reasonable inference that he is disabled within the meaning of the NMHRA. Mr. Spinelli's complaint does not mention the words "major life activity" or "substantially limiting," let alone provide any further detail on this point. We agree with Coherus that this omission regarding a major life activity is untenable.

*Id*. at 1281. While the plaintiff in *Spinelli* had identified various symptoms stemming from a prior injury (such as permanent nerve damage and some limited mobility), he had done "nothing to show how such symptoms" satisfy the statutory definition of disability.  *See id*.  The same can be said of plaintiff's showing here, yet on summary judgment.  Surely, if a plaintiff's failure to mention "major life activity" or "substantially limiting" is untenable at the 12(b)(6) stage, then plaintiff's failure to do so at this late stage is fatal to his claim.  *See id*. (citing *Berry v. T-Mobile USA, Inc*., 490 F.3d 1211, 1216 (10th Cir. 2007) (stating, at the summary judgment stage, that a plaintiff must identify at least one major life activity to satisfy the ADA's disability definition)).

For the foregoing reasons, the court grants summary judgment in favor of defendant on plaintiff's discriminatory discharge and failure-to-accommodate claims under the ADA.

---

[3] As noted by the Circuit in *Spinelli*, the New Mexico Supreme Court relies on Americans with Disabilities Act (ADA) precedent for guidance on NMHRA claims and has "functionally adopted the Tenth Circuit's articulation of the [ADA] as applied to a NMHRA claim." *Spinelli*, 167 F.4th at 1280 (citations omitted).

10

*B.    Retaliation for Requesting an Accommodation*

Plaintiff also asserts that defendant terminated his employment in retaliation for requesting accommodations including, as preserved in the pretrial order, his requests for time off during flare-ups, his request for heat in the garage, a cart to move materials, and a platform for ceiling work.[4] Because plaintiff relies on circumstantial evidence to establish his retaliation claim, the *McDonnell Douglas* burden-shifting framework applies. *Aubrey v. Koppes*, 975 F.3d 995, 1015 (10th Cir. 2020). To make out a prima facie case of retaliation for requesting accommodations, plaintiff must demonstrate that he engaged in protected activity; a reasonable employee would have found defendant's subsequent action to be materially adverse; and a causal connection exists between the protected activity and defendant's action. *Id.* Protected activity includes requesting an accommodation and adverse action taken in close temporal proximity to protected activity may be considered in establishing a causal connection. *Id.* at 1015-16 (citations omitted). If plaintiff establishes a prima facie case of retaliation, defendant must articulate a legitimate, nonretaliatory reason for the materially adverse action. *Id.* at 1016. The burden then shifts back to plaintiff to demonstrate that defendant's reason was merely a pretext for retaliating against him for seeking an accommodation for his disability. *Id.*

In its motion for summary judgment with respect to plaintiff's ADA retaliation claim, defendant does not mention plaintiff's requests for heat in the garage, a cart for moving materials,

---

[4] To prevail on his ADA retaliation claim, plaintiff need not show that he suffers from an actual disability. Instead, "a reasonable, good faith belief that the statute has been violated suffices." *See Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir. 2001).

11

or a platform for ceiling work.  Because defendant has made no effort to marshal the evidence concerning those requests for accommodation, defendant has not met its initial burden of showing the absence of a material factual dispute as to any issue with respect to these requests for accommodations.  This aspect of plaintiff's ADA retaliation claim, then, survives summary judgment.

The court turns, then, to plaintiff's request for time off during flare-ups.  Here, defendant argues that plaintiff cannot establish a prima facie case of retaliation because plaintiff's request for time off during flare-ups did not amount to protected activity and because plaintiff cannot establish the causation element of his prima facie case. The court rejects both arguments and finds that plaintiff has come forward with sufficient evidence to support his prima facie case of retaliation.

1.      Protected Activity

According to defendant, plaintiff cannot establish that he engaged in protected activity for purposes of his retaliation claim because he did not clearly communicate that he needed time off work due to a disability.  In making this argument, defendant relies on the Circuit's opinion in *Foster v. Mountain Coal Co.*, 830 F.3d 1178 (10th Cir. 2016).  In *Foster*, the Circuit stated that a request for accommodation can constitute protected activity for purposes of a retaliation claim so long as the request is "sufficiently direct and specific, giving notice that [the employee] needs a special accommodation." *Id*. at 1188 (citations and quotations omitted).  The Circuit emphasized that the request is not required to be in writing and does not have to formally invoke "the magic words" reasonable accommodation. *Id*.  The request simply has to "make clear that the employee

12

wants assistance for his or her disability." The *Foster* panel also quoted language from a Ninth Circuit case indicating that an employee "is not required to use any particular language when requesting an accommodation but need only inform the employer of the need for an adjustment due to a medical condition." *Id*. (quoting *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002)).

Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that plaintiff made an adequate request for accommodation—that is, a request direct and specific enough to put defendant on notice that he was requesting an accommodation for a medical condition. Plaintiff's August 2, 2023 text message to Ms. Jones teed up the disability issue when plaintiff specifically referenced the disability form and stated "let me know if I need to fill out anything" and that he had residual nerve damage "and some other issues" relating to a prior neck and shoulder surgery. Ms. Jones did not follow up on this text. Plaintiff testified that in early August 2023, after he texted Ms. Jones about the disability paperwork and his residual nerve damage, he verbally "advised her that [he] was going to need time off for flare-ups." He testified that Ms. Jones, in response, said that "she would be able to accommodate [him]." Ms. Flanagan also acknowledged in her deposition that plaintiff texted her about missing work due to neck or back pain, but she never responded because she felt like it was "not really any of [her] business." This evidence supports a reasonable inference that plaintiff requested a concrete, specific action from defendant (time off) for a specific medical condition (post-surgery residual nerve damage resulting in neck and back pain). It is sufficient to satisfy the "protected activity" prong on plaintiff's prima facie case. *See Foster*, 830 F.3d at 1183, 1188-89 (plaintiff's testimony that he told his employer that he had surgery scheduled and asked "for a little cooperation" was sufficient

to permit reasonable jury to interpret as adequate request for accommodation).   Summary judgment on this issue is inappropriate.

2.     Causation

Defendant also contends that plaintiff cannot establish a causal connection between any accommodation requests and the termination of his employment because, according to defendant, plaintiff's own testimony establishes a lack of causation.  Specifically, plaintiff testified to his belief that he was discharged for "standing up for people" and for "doing [his] job—trying to let people know what was going on."  According to defendant, then, plaintiff admits that he was fired for reasons other than requesting an accommodation. The problem with defendant's argument is that it asks the court (and plaintiff) to analyze the "real" reason for plaintiff's discharge at the prima facie stage. *See Frazier v. GPI KS-SH, Inc*., 2020 WL 2523290, at \*5 (D. Kan. May 18, 2020) (court cannot consider evidence concerning the basis for the plaintiff's discharge at the prima facie stage because it constitutes an impermissible "end run" around the *McDonnell Douglas* analysis) (citing  *EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1192–94 (10th Cir. 2000) (requiring plaintiff to disprove defendant's proffered reason for employment decision to establish prima facie case would inappropriately short circuit *McDonnell Douglas* analysis)).  Defendant's argument, then, is pertinent only at the pretext stage of the *McDonnell Douglas* analysis and the court will not consider it in connection with the prima facie case.  *See Cooper v. United Air Lines, Inc*., 82 F. Supp. 3d 1084, 1114 (N.D. Cal. 2015) (evidence that

14

plaintiff did not believe that her demotion was based on her pay disparity complaint but based on personality conflict with supervisor was considered at pretext stage).[5]

3.     Pretext

Having determined that plaintiff has produced evidence sufficient to support a prima facie case with respect to his claim that he was terminated for requesting time off during flare-ups, the court turns to whether defendant has met its burden to articulate a legitimate, nonretaliatory reason for its decision to terminate plaintiff's employment. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendant has carried it here. *See id.*  According to defendant, it terminated plaintiff's employment based on excessive absenteeism.  The burden of proof, then, shifts back to plaintiff to show that defendant's proffered reason is pretextual.  *Herrmann v. Salt Lake City*

---

[5] Although defendant addresses pretext in its reply brief, it does not reiterate this specific argument in its reply brief.  Regardless, plaintiff's testimony concerning the reason for his termination is not so conclusive as to warrant summary judgment in favor of defendant on this issue. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148 (2000) (Where a plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, summary judgment is appropriate only in those rare circumstances where the "record conclusively revealed some other, nondiscriminatory reason for the employer's decision" or the plaintiff "created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Corp.*, 21 F.4th 666, 679 (10th Cir. 2021) (citing *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016)).[6]

Plaintiff can demonstrate pretext by showing either that a retaliatory reason "more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Id*. at 680 (citations omitted). "In establishing pretext, an employee can show the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Id*. (citing *Foster*, 830 F.3d at 1194). As will be explained, the court concludes that plaintiff has met his burden of coming forward with evidence from which a reasonable jury could conclude that defendant's proffered reason is pretextual such that it could also conclude that defendant terminated plaintiff's employment in retaliation for plaintiff's accommodation request.

Significantly, defendant's proffered reason is this case is inextricably tied to plaintiff's request for accommodation—defendant says it fired plaintiff for excessive absenteeism but plaintiff says that he asked for time off due to his medical condition and was assured that his request could be accommodated. Moreover, despite plaintiff's evidence that he was told his request could be accommodated, defendant, just two months after telling plaintiff that his request for time off could be accommodated, provided plaintiff with a corrective action form for missing work. On that form, plaintiff indicated that he had missed work due to a "disability that is causing me to have to miss." While it is not clear from the record whether defendant ever followed up

---

[6] Although defendant did not reach the pretext issue in its initial brief, plaintiff in his response argues that he has come forward with sufficient evidence of pretext to survive summary judgment on this claim. Defendant, then, addresses pretext in its reply brief. While the court ordinarily would not address an issue raised for the first time in a reply brief, the court is comfortable addressing pretext here as plaintiff himself has raised that issue.

with plaintiff with respect to the notation made by plaintiff, there is other evidence that defendant ignored defendant's medical condition. When plaintiff texted Ms. Flanagan about missing work due to neck and back pain, she did not respond to these texts because she felt like it was "not her business." Less than three months after plaintiff indicated on the corrective action form that a "disability" had caused him to miss work, defendant terminated plaintiff for excessive absenteeism. Moreover, the conflicting evidence regarding whether plaintiff was asked to provide documentation of his medical issues or whether he was expressly told that he did not need to provide documentation of his medical issues casts further doubt on defendant's proffered reason for terminating plaintiff's employment.

In sum, the evidence in the record, taken as a whole and viewed in the light most favorable to plaintiff, is sufficient to call into question defendant's proffered reason for terminating plaintiff's employment. Defendant's apparent failure or reluctance to engage in an interactive process with defendant about his medical condition; its decision to terminate plaintiff for missing work despite evidence that plaintiff had asked for an accommodation in that regard; and its prior assurance that his accommodation request would be accommodated, taken together, is evidence from which a reasonable jury could conclude that defendant terminated plaintiff in retaliation for plaintiff's accommodation request. Summary judgment is denied and a jury must resolve this claim.

## IV.    Retaliatory Discharge in Violation of Kansas Public Policy

Plaintiff also asserts in the pretrial order that defendant terminated his employment because he reported to outside agencies that defendant had maintained conditions that were unsafe and

imposed an increased risk of fire in the Green Park Apartments complex. He further alleges wrongful discharge in violation of Kansas's public policy against disability discrimination based on his repeated requests for heat in the garage. The Kansas Supreme Court has recognized the tort of retaliatory discharge as a public policy exception to the employment-at-will doctrine. *See Palmer v. Brown*, 242 Kan. 893, 896 (1988). As the Court noted in *Palmer*:

> Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort.

*Id*. at 900. To establish this claim, a plaintiff has the burden of proving by clear and convincing evidence, under the facts of the case, that a reasonably prudent person would have concluded the plaintiff's employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; that the employer had knowledge of the plaintiff's reporting of such violation prior to discharge of the plaintiff; and that a causal connection exists between the report and the plaintiff's discharge. *Id*. Moreover, the whistle-blowing "must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain." *Id*. If the plaintiff establishes a prima facie case, the defendant then bears the burden of producing evidence that the plaintiff was terminated for a legitimate nonretaliatory reason. The burden then shifts back to the plaintiff to show that the defendant's reasons are pretextual. *Goodman v. Wesley Medical Center, LLC*, 276 Kan. 586, 590 (2003).

*Reports of Electrical Concerns/Increased Risk of Fire*

Defendants move for summary judgment on this claim on the grounds that plaintiff cannot establish a prima facie case of retaliatory discharge. Specifically, defendant contends that plaintiff's reports were not made in good faith; that plaintiff's reports amounted to mere "opinions" about wrongdoing and were not based on a clear mandate of public policy; and that plaintiff has not come forward with evidence from which a jury could conclude that anyone with input into the termination decision had knowledge of plaintiff's reports. Because defendant has not shown the absence of genuine factual disputes as to these issues, the court denies summary judgment on this claim.[7]

Defendant's good faith argument is based on its assertion that plaintiff reported to agencies "that there may have been a fire" when, in fact, plaintiff did not witness the fire so that any such report was speculative. But viewed in the light most favorable to plaintiff, he reported to agencies not that a fire had occurred, but that unsafe or faulty electrical wiring amounting to code violations existed at Green Park. This is consistent with plaintiff's evidence that he had reported his concerns to management beginning in November 2023 and that, around that same time, he had discussed the wiring issues with electrical contractors who had performed work at Green Park and who agreed with him that changes needed to be made to reduce the risk of fire. So, while plaintiff did not make any reports to outside agencies until after the January 4, 2024 electrical fire, those reports were not limited to the fire itself but focused on his continued concerns about the wiring at Green

---

[7] Defendant does not argue in its brief that plaintiff cannot establish that defendant's proffered reason for plaintiff's discharge is pretextual. It moves for summary judgment based solely on the elements of the prima facie case.

Park. Defendant points to no evidence suggesting that these reports were not made in good faith and a jury could reasonably conclude that plaintiff made the reports out of a concern for the safety of the residents at Green Park. The court also notes that the *Palmer* decision requires that an employee make a report in good faith "rather than from a corrupt motive such as malice, spite, jealousy or personal gain." 242 Kan. at 900. Although defendant contends that plaintiff was not motivated by good faith, it has offered no evidence supporting any other motive plaintiff might have had for raising his concerns. Although defendant is not required to come forward with evidence of an alternative motive, the lack of evidence concerning such motive further underscores the court's unwillingness to conclude as a matter of law that plaintiff was not acting in good faith. This is clearly a jury question.

Next, defendant, relying on *Goodman v. Wesley Medical Center,* argues that plaintiff cannot establish a prima facie case because his reports were based on his personal opinion of wrongdoing rather than on a clear mandate of public policy. 276 Kan. 586, 592-93 (2003).[8] In the pretrial order and his response, plaintiff points to K.S.A. § 31-313 as a specific expression of the public policy of safeguarding the public from fire. That statute allows the state fire marshal to adopt rules and regulations toward that end. The court has no doubt that the public policy of protecting the public from risk of fire is highly regarded in Kansas. Defendant, however, urges that it did not violate K.S.A. § 31-313 (obviously, as that statute imposes no obligation on

---

[8] In a related vein, defendant contends that no reasonably prudent person could have concluded that defendant was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare because none of the agencies that plaintiff contacted deemed the report worthy of an immediate investigation. That argument improperly brings a subjective component to the "reasonably prudent person" standard set forth in *Palmer*.

20

defendant) and that plaintiff's claim fails then because plaintiff has not identified a specific law or regulation that defendant violated. Defendant has not directed the court to authority for this requirement. *Goodman* speaks only to identifying a clear mandate of public policy and cautions that "public policy cannot be determined on a subjective basis." 276 Kan. at 592.  In another case, this court rejected the argument that a plaintiff's failure to identify a specific law or regulation implicated by the defendant's conduct was fatal to a retaliatory discharge claim.  *See Doud v. Countrywide Home Mortg. Loan*, 1997 WL 292127, at *10 (D. Kan. May 5, 1997) ("Plaintiff need not show that she reported an actual violation of a rule or law; rather, *Palmer* requires a showing that a reasonably prudent person would have concluded that violations of a law or regulation had taken place. Here, signatures of borrowers were forged on documents relating to loans backed by federal agencies. Thus, the court concludes that a genuine issue of fact exists concerning whether a reasonable person would have concluded that the forgeries constituted a violation of a law or regulation relating to the general welfare.").[9]

Lastly, defendant argues that plaintiff cannot establish a prima facie case of retaliatory discharge under Kansas law because he has not come forward with evidence from which a jury could conclude that anyone with input into the termination decision had knowledge of plaintiff's reports.  But the evidence viewed in plaintiff's favor clearly permits the inference that Ms.

---

[9] In any event, plaintiff has identified several regulations in his response that he contends were violated by defendant's conduct.  Defendant objects to these citations in its reply brief as causing unfair surprise and prejudice to defendant.  The court rejects this argument.  The pretrial order makes clear that the public policy relied upon by plaintiff was that reflected in the Kansas statute concerning the implementation of regulations by the state fire marshal to protect the public from risk of fire.  The specific regulations cited by plaintiff in his response brief fall within that category.

Flanagan knew about plaintiff's reports and had meaningful input in the decision to terminate plaintiff's employment. To begin, Ms. Flanagan candidly acknowledged in her deposition that plaintiff "mentioned" to her "in passing" that he had contacted a state agency. Plaintiff also testified that, after he made his phone calls to various agencies, he told Ms. Flanagan about those calls and his frustration that "nobody was doing anything to help the residents to keep them safe." With respect to Ms. Flanagan's role in the decisionmaking process, Ms. Jones testified that the decision was a "collective effort" among "multiple people" including herself, Ms. Flanagan, Brooke Harms and Blake Hunter. Defendant highlights that Ms. Flanagan testified that her role was limited to confirming the dates that plaintiff was absent from work. But Ms. Jones testified that Ms. Flanagan, as the site manager, initiated the discussion about terminating plaintiff's employment for excessive absenteeism. The evidence in the record, then, is sufficient for a jury to conclude that defendant had knowledge of plaintiff's reports before terminating his employment. Defendant's motion for summary judgment on this specific theory of plaintiff's retaliatory discharge claim is denied.

*Requests for Heat in Garage*

Plaintiff also asserts a public policy claim based on his repeated requests for heat in the garage as an accommodation for his alleged disability, contending that defendant's failure to provide heat violates Kansas's public policy against disability discrimination and public policy underpinning the Americans with Disabilities Act.[10] Defendant moves for summary judgment on

---

[10] There is evidence in the record that plaintiff complained about the lack of heat in the garage for reasons not tied to his disability—he complained that heat was required for the safety of all

this claim on the grounds that the requests were "unreasonable" in light of defendant's efforts to provide an alternative work space with heat and the option of using space heaters while defendant attempted to find another solution for heat in the garage and because there is no public policy pertinent to providing heat in defendant's garage.  The court does not address these arguments because the claim clearly fails as a matter of law.

In *Polson v. Davis*, the Tenth Circuit predicted that the Kansas Supreme Court would "adopt the view that the KAAD [Kansas Act Against Discrimination] provides an adequate and exclusive state remedy for violation of the public policy enunciated therein" such that the plaintiff's remedies under Kansas statutory law precluded recovery under the tort of wrongful discharge. 895 F.2d 705, 709 (10th Cir.1990).  The Kansas Supreme Court has acknowledged the Tenth Circuit's *Polson* decision and concluded that the Circuit "was correct in surmising the Kansas rule to be that an adequate alternative remedy precludes a common-law retaliatory discharge action." *See Flenker v. Willamette Indus., Inc.*, 266 Kan. 198, 209 (1998).

The Tenth Circuit has also held that the *Polson* rationale extends to plaintiffs seeking to assert a common law cause of action for retaliation when they have a federal statutory right. *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1399 (10th Cir.1997). And judges in this district have long recognized that the ADA provides an adequate remedy such that Kansas state law claims based on the same underlying conduct are barred. *See Sporleder v. U.S. Bancorp*, 2019 WL 3716453, at *2-3 (D. Kan. Aug. 7, 2019) (adequate remedies doctrine applies to the ADA

---

employees working in the garage because, according to plaintiff, the cold temperatures and resulting cold hands made it dangerous for employees to operate power tools.  But plaintiff does not make this argument in response to the motion, focusing solely on the disability public policy argument.

such that plaintiff's claim for retaliatory discharge in violation of Kansas public policy was precluded); *Lines v. City of Ottawa*, 2003 WL 21402582, at *10 (D. Kan. June 16, 2003) (granting summary judgment on state law retaliatory discharge claim where adequate alternative remedies existed under ADA); *Williams v. Prison Health Servs.*, 159 F. Supp. 2d 1301, 1315 (D. Kan. 2001) (same).

In short, because adequate statutory remedies are available to plaintiff under the ADA, the court grants summary judgment in favor of defendant on this theory of plaintiff's wrongful discharge claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 52) is **granted in part and denied in part.**

**IT IS SO ORDERED.**

Dated this 2nd day of April, 2026, at Kansas City, Kansas.

s/John W. Lungstrum
John W. Lungstrum
United States District Judge

24